UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SHELLEY RUBIN and MAUREEN I. FELLER,

    Plaintiffs,

 vs.

CITY OF LANCASTER,

    Defendant.

CASE NO. CV 10-4046 DSF (JCx)

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

Having considered the evidence presented by the parties and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.[1]

---

[1] The Court Trial Order required the parties to file a copy of the opposing party's proposed findings of fact and conclusions of law, marked as follows: "(a) Strike through those portions the party disputes; (b) Bold those portions the party admits; and (c) Underline those portions the party admits but considers irrelevant." Defendant complied with this Order; Plaintiffs did not. The Court has included certain admitted facts even if no specific evidence was provided. At trial Plaintiffs limited their claim to the April 27, 2010 invocation, (Tr. 4), and specified that they challenge only the reference to "Jesus" in that invocation, (Tr. 83-84). By including certain facts in these findings, the Court does not suggest that the facts are relevant to the claim before the Court.

# FINDINGS OF FACT

1. The parties have stipulated that Plaintiffs Shelley Rubin and Maureen I. Feller have standing to pursue this action. Rubin is Jewish; Feller is Christian.

2. Defendant City of Lancaster is a municipal corporation duly organized, existing, and operating under the laws of the State of California.

3. Lancaster's City Council holds regular meetings on the second and fourth Tuesday of each month. For many years prior to August 10, 2009, the City Council opened its meetings with invocations that contained explicitly sectarian religious references, including specific references to Jesus Christ. A substantial majority of the prayers were Christian in nature.

4. On August 10, 2009, the American Civil Liberties Union sent to the mayor and City Council members a letter that referred to complaints it received with respect to the practice of opening meetings with invocations referring to Jesus Christ or containing other explicitly sectarian religious references. (Pls.' Tr. Brief, Ex. A.)

5. At its regular meeting on August 25, 2009, the City Council approved and adopted its "Policy Regarding Invocations at Meetings of the City Council of the City of Lancaster" ("Invocation Policy"). The Invocation Policy was admitted as Exhibit 3.

6. Lancaster's City Manager promulgated Administrative Policies and Procedures ("Procedures") to implement the Invocation Policy. The Procedures were admitted as Exhibit 4.

7.  Pursuant to the Invocation Policy and the Procedures, Lancaster's City Clerk compiles and maintains a database of the religious congregations with an established presence in the City.

8.  The City Clerk compiles this list by referencing Lancaster's Yellow Pages listings for "churches," "congregations," and other religious assemblies; conducting research on the internet using search terms such as "synagogue," "church," "temple," "chapel," and "mosque"; consulting the local chamber of commerce; and consulting the *Antelope Valley Press*. The list is updated annually.

9.  All religious congregations with an established presence in the City are eligible to be included on the list.

10.  The City Clerk has never removed anyone from the list, or refused to include anyone on the list.

11.  The City Clerk does not inquire into the faith, denomination, or other religious belief of a congregation included on the list, or that asks to be included on the list.

12.  The City Clerk mails to the congregations on the list a letter inviting them to give an invocation before a City Council meeting. Pursuant to the Invocation Policy, the letter states: "This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. To maintain a spirit of respect and ecumenism, the City Council requests that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker nor to disparage any faith or belief different than

that of the invocational speaker."

13. A congregation may deliver an invocation only three times a year, and may not do so at two consecutive City Council meetings.

14. Every person who has volunteered to deliver an invocation before a City Council meeting has been scheduled to do so.

15. No compensation is offered in exchange for giving an invocation.

16. Neither the City Manager nor any member of the City Council has instructed the City Clerk concerning the scheduling of speakers or attempted to influence how she schedules speakers.

17. On November 10, 2009, the City Council decided to submit to City voters a non-binding measure ("Measure I") which asked: "In response to a recent complaint, with respect to the invocations that contained a reference to Jesus Christ shall the City Council continue its invocation policy in randomly selecting local clergy of different faiths to deliver the invocation without restricting the content based on their beliefs, including references to Jesus Christ?"

18. Lancaster's City Attorney was obligated to submit an impartial analysis of the measure to allow the electorate to make an informed decision. The City Attorney's legal analysis stated that the Invocation Policy was consistent with the Supreme Court's decision in Marsh v. Chambers, 463 U.S. 782 (1983) and the Eleventh Circuit Court of Appeals' decision in Pelphrey v. Cobb County, 547 F.3d 1263 (11th Cir. 2008). It did not mention the California Court of Appeal's decision in Rubin v. City of Burbank, 101 Cal. App. 4th 1194 (2008).

19. Lancaster's mayor and vice mayor submitted a ballot argument in favor of Measure I, which stated: "It is every INDIVIDUAL'S RIGHT to pray in accordance with their [sic] own convictions and beliefs; and to pray to the deity of their [sic] own choosing including in the name of JESUS CHRIST."

20. No one submitted a ballot argument in opposition to Measure I.

21. At the April 13, 2010 general municipal election, Measure I passed with 9,765 votes in favor and 3,116 votes in opposition.

22. The passage of Measure I had no impact on the Procedures followed by the City Clerk.

23. The City Clerk has deviated from the Invocation Policy/Procedures twice. The first deviation occurred with regard to the April 27, 2010 City Council meeting, which was the first meeting after the passage of Measure I. Pastor Chappel, the originally scheduled invocation speaker, cancelled his appearance and requested that the City Clerk invite Bishop Henry Hearns, who was also a member of his congregation. The City Clerk granted the request, and Hearns agreed to give the April 27 invocation.

24. Hearns is also Lancaster's former mayor. At the time of the April 27 invocation and at the time of trial, he was the honorary mayor.

25. The second deviation occurred with regard to the May 11, 2010 City Council meeting, which was approximately one week after the filing of the instant lawsuit. Approximately three to four weeks before the meeting, the originally

scheduled speaker (a Christian) had cancelled.  The City Manager suggested that the City Clerk invite non-Christians to give the invocation for any vacancies.  About two or three weeks before the meeting, the City Clerk sent emails to someone of the Jewish faith and the Muslim faith, but got no response.  The City Clerk then sought help from one of the planning commissioners whom she knew to be of the Sikh faith.  She then invited Nirinjan Singh of the California Sikh Council, and Singh accepted.

26.  Since the City Council adopted the Invocation Policy: (1) twenty invocations were given by people from Christian denominations, and each included a reference to Jesus or Jesus Christ; (2) four invocations were by a person who identifies as a metaphysicist; (3) one invocation was given by a member of the California Sikh Council; and (4) one invocation was given by a person from an Islamic congregation.  On four occasions no invocation was given because the scheduled speaker cancelled or was absent.  No meetings were held on November 23, 2010 or December 28, 2010.  When counted only from the date of the challenged invocation, April 27, 2010, nine additional invocations included references to Jesus or Jesus Christ and five invocations have not included such references.  (Joint Stipulation of the Parties, Docket # 36.)

27.  Mayor Parris personally paid for and attended a private meeting of the Ministerial Association in 2010.  At that meeting, Mayor Parris said: "We are growing a Christian community, and we should not shy away from that."  He may have made a similar statement during the State of the City address, as was reported in a local newspaper.  He has made speeches to organizations such as the Chamber of Commerce and Rotary Club that did not contain such statements.

28.  It is Mayor Parris's personal belief, elected position, and intent, to grow

a Christian community in Lancaster. He testified that he meant a "community where we love our neighbors, that we take care of our neighbors, that we protect our neighbors." He further testified that this is his policy; it is not an official City policy.

29. Other than encouraging "a lot of religious leaders including Sikhs, Rabbis, and Muslims to sign up for it," Mayor Parris had nothing to do with the creation of the list. There is no evidence that he has participated or influenced or attempted to influence the scheduling of any individual to deliver an invocation at any particular meeting. Other than calling the person who is scheduled to give the invocation, he is not involved in the process. He has never inquired into, reviewed, or been involved in the content of any invocation given at a City Council meeting.

30. Plaintiffs attended the City Council meeting on April 27, 2010 at which Hearns stated the following:

> Our Father we come to you tonight with a great honor that you have given us to be in America, in the land of the free and brave. You've brought us from all cultures, walks and levels of education even into this room tonight and we thank you for it. I particularly thank you for the men and women that have selected to stand forward in the midst of all that can come at them and say yes, I will be one of those who will help govern my city to be the best city it could ever be in this country or anywhere else. Now, Master, we can't do it without your wisdom. But with your wisdom it is definitely possible. We thank you for what we see going on in the streets, the buildings and all of the other things that are happening because of the forethought of the Council that are sitting and is to come. So now Lord I pray starting with our Mayor,

ask that you give him wisdom and to speak to him in a way maybe like only you can speak and only he can hear. I pray for our Vice-Mayor, I pray for each Council Member, I pray for those who will be seated, and I just ask you now Lord on behalf of the City, on behalf of every person in this City, I pray for fairness and equitable for every person that walk into this hall. I pray for every staff member, I pray for our City Manager, Mark, and all of those men and women who work under him. God, we can't move without you. Help us tonight as we dive into 2010 and on. Would you bless us Lord? Bring our minds to know you and in the precious, holy and righteous and matchless name of Jesus I pray this prayer. Amen and Amen. God bless you.

31. Plaintiffs were upset and offended because Hearns mentioned the name Jesus. Neither plans on attending additional City Council meetings until the Invocation Policy forbids people from referring to "Jesus" or "Jesus Christ."

32. Though their pleadings are somewhat ambiguous as to the scope of their claim, Plaintiffs clarified at the trial that they challenge only the invocation given April 27, 2010, and challenge only the reference to Jesus, (Tr. 4, 83-84; but see Tr. 85), though both earlier and later invocations have on occasion also referred to Jesus or Jesus Christ. Plaintiffs do not ask that the Court change the City's Invocation Policy; instead they ask that, considering the context in which the invocation was given, the Court find that the April 27, 2010 invocation violated the Establishment Clause. (Tr. 85.) They also seek an injunction prohibiting the City "from allowing any session of its City Council to include an invocation wherein the name of Jesus Christ is spoken." (Pls.' Tr. Brief 1; see, e.g., Tr. 5-6, 80, 88.)

# CONCLUSIONS OF LAW

## A. Plaintiffs Fail to Establish a Violation of 42 U.S.C. § 1983

1. To state a claim under 42 U.S.C. § 1983, a plaintiff must prove "(1) that a right secured by the Constitution or laws of the Untied States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." Long v. Cnty. of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

2. Plaintiffs do not challenge the Invocation Policy itself. (Tr. 7.) They argue instead that references to Jesus in such invocations - specifically the reference made by Hearns during the April 27, 2010 invocation - violate the First Amendment's Establishment Clause. (Tr. 4, 83-84.) Pursuant to the Establishment Clause, the government "shall make no law respecting an establishment of religion . . . ." U.S. Const. Amend. I. The Establishment Clause applies to the states under the Fourteenth Amendment. See Murdock v. Pennsylvania, 319 U.S. 105, 108 (1943).

3. Plaintiffs presumably contend the City of Lancaster should have prohibited Hearns from referring to Jesus, as the City is the only defendant.

4. The parties agree that the Invocation Policy, and Hearns' invocation in particular, should be analyzed by the law governing "legislative prayer."

5. The United States Supreme Court first addressed the constitutionality of legislative prayer in Marsh v. Chambers, 463 U.S. 783 (1983), where the Court considered whether Nebraska's practice of opening its legislative sessions with an

invocation violated the Establishment Clause. Id. at 785-86. Both parties agree Marsh controls the Court's analysis (though Plaintiffs contend that case was wrongly decided).[2]

6. In deciding that legislative prayer is not a per se violation of the Establishment Clause, the Supreme Court noted that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." Id. at 786. The Court also concluded that the first Congress's use of the practice showed that "the First Amendment . . . draftsmen saw no real threat to the Establishment Clause arising from a practice of prayer similar to that . . . challenged." Id. at 791.

7. The Supreme Court found that Nebraska's practice of opening its legislative sessions with an invocation did not violate the Establishment Clause even though (1) a clergyman of only one denomination had given the opening prayer for 16 years; (2) the state paid the chaplain to provide the opening prayer; and (3) the prayers were in the "Judeo-Christian tradition." Id. at 793. The Court rejected the first concern because the evidence showed the minister had been reappointed due to his performance and personal qualities, and not because of his religious beliefs. Id. It rejected the second concern because historically the person who gave the opening prayer at a legislative session had been paid with government funds. Id. at 794. With respect to the third concern, the Supreme Court held:

---

[2] The Ninth Circuit has noted that "Marsh is a narrow opinion that should be construed as carving out an exception to normal Establishment Clause jurisprudence due to the 'unique history' of legislative prayer." Card v. City of Everett, 520 F.3d 1009, 1014 (9th Cir. 2008).

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for [the court] to embark on a sensitive evaluation or to parse the content of a particular prayer.

Id. at 794-95. In a footnote, the Supreme Court noted that the minister characterized his prayers as "nonsectarian," "Judeo Christian," and as having "elements of the American civil religion," and that although some of his earlier prayers were "explicitly Christian," the minister removed all references to Jesus Christ after a legislator complained. Id. at 793 n.14.

8. Plaintiffs have made clear that their contention that the April 27 invocation violates the Establishment Clause rests solely on the single reference to Jesus. (Tr. 4, 83-84.) Plaintiffs have presented no evidence or argument to suggest that the April 27 "prayer opportunity [was] exploited to proselytize or advance any one, or to disparage any other, faith or belief," and have not contended that it had this purpose or effect. (See Complaint; Pls.' Tr. Brief; Pls.' Proposed Findings of Fact and Conclusions of Law.)

9. Whether Marsh's footnote 14 established a "bright-line" rule prohibiting "sectarian" legislative prayer, or merely noted an historical fact about the case, has been the subject of substantial debate. For example, six years after deciding Marsh, the Supreme Court considered a challenge to the constitutionality of a crèche in a county courthouse and a Chanukah menorah outside a city and county building in County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573 (1989). The Court found the display of the menorah acceptable, but not the display of the crèche. Justice Blackmun, for the majority, responded "in some

depth" to Justice Kennedy (joined by three other justices), who argued in dissent that Marsh compelled the conclusion that both displays were consistent with the Establishment Clause. In that portion of his opinion, Justice Blackmun reiterated that although legislative prayers are not per se unconstitutional, they cannot "have the effect of affiliating the government with any one specific faith or belief." Id. at 603. He also opined that "[t]he legislative prayers involved in Marsh did not violate this principle because the particular chaplain had 'removed all references to Christ.'" Id. at 603 (quoting Marsh, 463 U.S. at 793 n.14).

10. Subsequent cases evaluating Establishment Clause challenges - in this and other contexts - have not reached consensus. As evidenced by the briefing in this case, those who advocate only "nonsectarian" prayer (if prayer is to be permitted at all) interpret Allegheny's reference to Marsh as a blanket prohibition against "sectarian" prayer. See, e.g., Wynne v. Town of Great Falls, South Carolina, 376 F.3d 292 (4th. Cir. 2004)[3]; Rubin v. City of Burbank, 101 Cal. App. 4th 1194 (2002). Two other opinions supporting this view, Doe v. Tanipahoa Parish School Board, 473 F.3d 188 (5th Cir. 2006) and Hinrichs v. Bosma, 440 F.3d 393 (7th Cir. 2006), were vacated or reversed and remanded with instructions to dismiss for lack of standing.

11. Those who reject this supposed "bright-line"[4] rule, and advocate for a

---

[3] Arguably, even Wynne does not take this position. See Simpson v. Chesterfield Cnty. Bd. of Supervisors, 404 F.3d 276, 283-84 (4th Cir. 2005) (noting Wynne was concerned with "repeated invocations of a single faith").

[4] As many of these cases - including Marsh - illustrate, even the line between sectarian and non-sectarian is not always clear. See, e.g., Pelphrey v. Cobb Cnty., Ga., 547 F.3d 1263, 1272 (11th Cir. 2008). As the Eleventh Circuit noted, whether certain references

policy that allows "sectarian" prayer so long as it is not "exploited to proselytize or advance any one, or to disparage any other, faith or belief," rely heavily on Marsh's mandate not to "embark on a sensitive evaluation or to parse the content of a particular prayer." See, e.g., Pelphrey v. Cobb Cnty., Ga., 547 F.3d 1263, 1271-72 (11th Cir. 2008); Snyder v. Murray City Corp., 159 F.3d 1227 (10th Cir. 1998) (en banc); Galloway v. Town of Greece, 732 F. Supp. 2d 195 (W.D.N.Y. 2010); Doe v. Indian River Sch. Dist., 685 F. Supp. 2d 524 (D. Del. 2010); Doe v. Tangipahoa Parish Sch. Bd., 631 F. Supp. 2d 823 (E.D. La. 2009); see also Lee v. Weisman, 505 U.S. 577 (1992) (holding a school could not provide for "nonsectarian" prayer to be given by clergyman selected by the school); Turner v. City Council of Fredricksburg, 534 F.3d 352 (4th Cir. 2008) (upholding policy permitting only nondenominational prayers, expressly declining to hold that Marsh requires such a policy, and applying Marsh's prohibition against parsing the content of a particular prayer); Simpson v. Chesterfield Cnty. Bd. of Supervisors, 404 F.3d 276, 283-84 (4th Cir. 2005) (noting defendant "has aspired to nonsectarianism and requested that invocations refrain from using Christ's name," but describing terms used by clerics, including "the God of Abraham, of Moses, Jesus, and Mohammad," "King of Kings," and others). These cases have thoroughly analyzed the topic and the Court can add little or nothing to the debate. Having reviewed these cases and others, the Court concludes that Marsh does not prohibit sectarian prayer and specifically does not prohibit references to Jesus or any other deity. Instead, Allegheny's reference is best viewed as describing one possible means of assuring that the legislative prayer does not have the prohibited purpose or effect. See Turner, 534 F.3d at 356.

      12. Plaintiffs rely heavily on Rubin v. City of Burbank, 101 Cal. App. 4th

"are 'sectarian' is best left to theologians, not courts of law." Id. at 1267.

1194 (2002),[5] a case in the "bright-line" rule category. Id. at 1203-04. As previously noted, although the "bright-line" rule may (arguably) be easier to enforce, this Court does not find the analysis persuasive. The Court in Rubin does not point to any factor other than the actual content of the prayer to support a finding that the City of Burbank used its legislative prayer for an improper purpose. But - as previously stated - Marsh prohibits that approach: "[I]t is not for [the court] to embark on a sensitive evaluation or to parse the content of a particular prayer." Marsh, 463 U.S. at 795.[6]

13. Joyner v. Forsyth County, North Carolina, 2009 WL 3787754 (M.D. N.C. 11/9/09), the only district court case cited by Plaintiffs, does not support their position. All that can be gleaned from the brief order there is that the district court found that the specific prayers at issue "did not reflect diversity and inclusiveness, and instead were divisive and had the effect of affiliating the Government with one particular belief." But the court described neither the prayers themselves nor the policy or practice through which they were presented.

14. Plaintiffs also cite to Bacus v. Palo Verde Unified School District, 11 F.

---

[5] The parties have not pointed to any binding Ninth Circuit authority directly on point, and the Court has found none. The court in Rubin based its decision on the United States Constitution rather than California's equivalent constitutional provision, and therefore its holding is not binding, even as to Plaintiffs' state law claim.

[6] Plaintiffs assert in their complaint: "The decision . . . in Rubin v. City of Burbank is the law in California and must be followed and respected by all cities and by all Superior Courts." (Compl. ¶ 16.) But 42 U.S.C. § 1983, pursuant to which the federal claim is brought, does not provide relief for "violations" of a state court's interpretation of the United States Constitution. And Rubin did not purport to interpret the California Constitution. Neither party briefed whether Rubin would have any impact on the conduct of the City of Lancaster if this Court were to rule against Plaintiffs. That is a matter of state law better left to a California court.

Supp. 2d 1192 (C.D. Cal. 1998), a decision they describe as arguably supporting the City's position. By citing to the Ninth Circuit's unpublished decision reversing the district court, 52 Fed. Appx. 355 (9th Cir. 2002), Plaintiffs suggest the Ninth Circuit has adopted their interpretation of Marsh. Not so. The Ninth Circuit specifically stated that it "need not decide whether prayers 'in the Name of Jesus' would be a permissible solemnization of a legislature-like body, provided that invocations were, as is traditional in Congress, rotated among leaders of different faiths, sects, and denominations." Id.[7]

15. Plaintiffs argue that "there has been a history of this sort of conduct," and that the Policy is only "a nod and a wink" that "looks good on paper" but has not been followed. (Tr. 4-6, 85-86.) Plaintiffs therefore ask that the Court view the April 27, 2010 invocation "in context." (Tr. 4-6, 76, 85-86.) But such an analysis does not support Plaintiffs' cause. There is no evidentiary support for Plaintiffs' apparent contention that the Invocation Policy or Procedures, which on their face encourage participation by members of all faiths and discourage proselytizing and disparagement - are a sham. Plaintiffs do not challenge the testimony of Geri Bryan, the City Clerk who prepares the list. The Joint Stipulation establishes that members of various faiths have accepted the City's invitation and given invocations. Plaintiffs' contention that the timing of the attendance of Nirinjan Singh, director of the California Sikh Council, was suspicious, was disproved by evidence that established his presence had been arranged before the instant lawsuit was filed. Although the statement in support of Measure I specifically endorses allowing references to Jesus Christ, it also

---

[7] The district court in Indian River cited several occasions on which prayers given in the United States House of Representatives referred to Jesus. Indian River, 685 F. Supp. 2d at 542 n.137.

endorses reference to any deity chosen by the person giving an invocation. Because Measure I was meant to address the letter from the American Civil Liberties Union that specifically condemned references to Jesus Christ, the Court finds nothing nefarious in the Measure's reference to Jesus Christ. The Court also finds that the City Attorney's analysis of Measure I provided a correct statement of federal constitutional law. In addition, whatever one may conclude about the statements of Lancaster's mayor, neither the mayor's personal beliefs nor his comments concerning a "Christian community" - though offensive to some - establish an intent on the part of the City to avoid the mandate of <u>Marsh</u>, especially considering that uncontroverted evidence established that the mayor has no input into the selection process. In fact, Plaintiffs' evidence is less compelling than the evidence rejected by the Supreme Court in <u>Marsh</u>.

16. Plaintiffs state they are not asking the Court to "change" the Invocation Policy, but rather are asking that the Court "declare" that the April 27, 2010 invocation violated the Establishment Clause, and "comment" on the others. (Tr. 85.) Assuming, without deciding, that Plaintiffs have properly requested a ruling on the constitutionality of the Invocation Policy, the Court concludes that Plaintiffs have failed to establish that the Policy has been used for an improper purpose or is otherwise unconstitutional. Volunteers of numerous faiths are invited to and have given invocations before City Council meetings, and the selection process does not discriminate against any faith. In addition, the City imposes no content requirement save for asking that volunteers not use the opportunity "as an effort to convert others to the particular faith" or "to disparage any faith or belief . . . ." Thus, the City's policy and practice asks participants to respect the parameters set forth in <u>Marsh</u>. There is no suggestion, much less any evidence, that on the single occasion when the City Clerk sought someone from a specific faith, she did so to

proselytize, advance, or disparage any particular faith.

17. Determining that the April 27, 2010 invocation violated the Establishment Clause by its single reference to Jesus would require this Court to analyze the content of the prayer. But because Plaintiffs do not even claim the April 27 invocation was "exploited to proselytize or advance any one, or to disparage any other, faith or belief," this Court cannot properly perform such an analysis. Marsh, 463 U.S. at 794-95. Because their evidence fails to show the April 27 invocation (or the Invocation Policy itself) would have the "effect of affiliating the government with any other one specific faith or belief," Plaintiffs have not shown an Establishment Clause violation. Allegheny, 492 U.S. at 603.

## B. Plaintiffs Fail to Establish a Violation of Article I, Section 4 of California's Constitution

18. Because Article I, Section 4 of California's Constitution is coextensive with the First Amendment's Establishment Clause, see East Bay Asian Local Dev. Corp. v. State, 24 Cal. 4th 693, 718 (2000), Plaintiffs' claim that Defendant violated this section must fail as well.

## CONCLUSION

For these reasons, the Court concludes that Plaintiffs have not proven an Establishment Clause violation or a violation of Article I, Section 4 of the California Constitution.

Dated: July 11, 2011

Dale S. Fischer
United States District Judge